**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LAKEISHA JORDAN, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 11-1642 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 61, 62, 64, 82, 88 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART
DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN
PART DEFENDANT PIW'S MOTION FOR SUMMARY JUDGMENT; DENYING AS MOOT
DEFENDANT PIW'S MOTION FOR LEAVE TO FILE AN AMENDED ANSWER; AND DENYING AS
MOOT PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY**

**I. INTRODUCTION**[1]

Plaintiff Y.F. was taken into the custody of the District of Columbia's Child and Family

Services Agency ("CFSA") when she was seven years old after the District filed a petition for

abuse and neglect of a minor child against her mother, Plaintiff Lakeisha Jordan. While in

CFSA's custody, Y.F. was admitted as an inpatient at the Psychiatric Institute of Washington

("PIW"), where she was diagnosed with bipolar disorder.[2] To treat Y.F.'s condition, and to

---

[1] The Court granted the parties' respective motions to file their motions for summary
judgment under seal, as those motions disclose confidential information about Plaintiff Y.F.'s
medical history. *See* Mar. 16, 2016 Order, ECF No. 63. The parties filed redacted versions of
their motions, which are publicly available on the docket. *See* ECF Nos. 66, 68, 85.
Accordingly, the Court will similarly redact the public, unsealed version of this memorandum
opinion to withhold confidential information. The Court notes, however, that it has not redacted
information that Plaintiffs have previously disclosed publicly in their Amended Complaint, even
if that information was subsequently redacted in the parties' motions for summary judgment.
*See generally* Am. Compl., ECF No. 18.

[2] Defendant PIW states that it has been "incorrectly named as The Psychiatric Institute of
Washington" and indicates that its proper name is Wisconsin Avenue Psychiatric Center, Inc.

control her sometimes violent outbursts, Y.F. was subjected to physical holds, restraints, and seclusions, and was prescribed several types of psychotropic medication.  On behalf of herself and Y.F., Ms. Jordan brought suit against PIW and the District of Columbia claiming that Y.F.'s treatment at PIW was performed negligently, without Ms. Jordan's consent, and violated the Fifth Amendment's Due Process Clause.  Now before the Court are the parties' cross-motions for summary judgment (ECF Nos. 61, 62, 64).  Plaintiffs have moved for partial summary judgment with respect to their § 1983 constitutional claim, while Defendants have each moved for summary judgment on all claims.  Also pending before the Court is PIW's motion for leave to file an amended answer raising a defense of qualified immunity.  For the reasons stated below, the Court concludes that no reasonable jury could find on this record that the District of Columbia's or PIW's treatment of Y.F. exceeded constitutional bounds and, therefore, that Plaintiffs cannot show the predicate constitutional violation necessary to succeed on their § 1983 claim.  As a result, the Court will deny Plaintiffs' motion for partial summary judgment, grant in part Defendants' respective motions for summary judgment, and remand the remaining D.C. law claims to the District of Columbia Superior Court.

## II.  FACTUAL BACKGROUND

In September 2006, the District of Columbia filed a petition for abuse and neglect of a minor child against Y.F.'s mother, Lakeisha Jordan.  *See* D.C.'s Statement of Material Facts ¶ 2, ECF No. 65; D.C. Ex. 2 at 3, ECF No. 65-2.  Pursuant to an order of the District of Columbia Superior Court, Y.F. ███████████ were taken into CFSA's physical custody ███████ ███████████ .  *See* D.C. Ex. 2 at 3–4. ███████████████

---

(which does business as PIW).  *See* PIW's Mem. Supp. Summ. J. at 11, ECF No. 62.  For consistency, the Court will nevertheless refer to Defendant as PIW.

██████████████████████████████████████████████ *See* D.C. Ex. 3,

ECF No. 65-3. ████████████████████████████████████████, *see*

*id.*, ██████████████████████████████████████, *see* D.C.'s Statement of

Material Facts ¶ 6.  On November 1, 2006, ████████████████████████████

██, the Superior Court ordered that Y.F. be involuntarily committed on an emergency basis.  *Id.*

¶ 7; D.C. Ex. 6, ECF No. 65-6.  Y.F. ████████████████████████████████

██████████████████████ was admitted on November 2, 2006 pursuant to another

court order and was initially diagnosed with intermittent explosive disorder.  *See* D.C. Ex. 6;

PIW Ex. D, ECF No. 62-6.  The District agrees that, throughout Y.F.'s commitment at PIW, and

despite the fact that Y.F. was in the District's legal custody, Ms. Jordan's parental rights were

never terminated.  *See* D.C.'s Resps. to Pls.' First Req. for Admis. at 6.

      Y.F. was treated at PIW for five months.  PIW Ex. G, ECF No. 62-9.  During that time,

Y.F. was diagnosed with bipolar disorder.  *Id.* at 3.  Her discharge summary notes that ████

██████████████████████████████████████████████████.  *Id.* at 2.  ████

█████████████████████████████████████████████████████████████████

███████████████████████████████  *Id.*  ██████████████, Y.F. was

sometimes placed in physical holds or other forms of restraint.  *Id.*  PIW also made use of

seclusions, which involve placing a patient in a locked, quiet room while staff observe the patient

through a window.  *See* PIW's Statement of Material Facts ¶ 28.  ██████████████████

█████████████████████████████████████████████████████████████████

██████  *Id.* ¶ 26.

Y.F.'s physicians prescribed a variety of medications including, but not limited to, Zyprexa, Seroquel, Risperidal, Haldol, Lithium, Clonidine, and Zyrtec.[3]  *See* D.C. Exs. 9–10, ECF Nos. 65–9, 65–10.  At times, PIW solicited consent to administer these medications from CFSA's Office of Clinical Practice ("OCP").  CFSA admits in response to Plaintiffs' request for admissions that it is unable to confirm that it provided consent for each instance in which Y.F. was medicated, although it did provide consent on "some occasions."[4]  D.C.'s Resps. to Pls.' First Req. for Admis., ECF No. 64 at 26–32; D.C.'s Am. Answers to Pls.' First Req. for Admis., ECF No. 64 at 127–129.  Nevertheless, Ms. Jordan testified during her deposition that she was generally aware that Y.F. was receiving medication.  She testified that she visited Y.F. approximately 25 times while Y.F. was committed at PIW, and that she became worried when Y.F. appeared sad, drowsy, and otherwise unlike herself.  D.C.'s Statement of Material Facts ¶¶ 19–20.  Y.F.'s social worker informed Ms. Jordan that Y.F.'s change in demeanor was likely due

---

[3] To describe these medications the parties appear to use the terms "antipsychotic" and "psychotropic" interchangeably.  The Court does the same.  *Accord Washington v. Harper*, 494 U.S. 210, 213 (1990) ("Antipsychotic drugs, sometimes called 'neuroleptics' or 'psychotropic drugs,' are medications commonly used in treating mental disorders such as schizophrenia.").

[4] There is some dispute in the record regarding the frequency of CFSA's consent.  PIW claims that it generally "sought consent from OCP to administer psychotropic drugs to Y.F."  *See* PIW's Statement of Material Facts ¶ 32, ECF No. 62-1.  But Plaintiffs allege that PIW medicated Y.F. "without consistently seeking consent from CFSA or OCP," Am. Compl. ¶ 22, and the District admits that it "is not able to determine that it provided consent on behalf of Y.F." on all occasions, D.C.'s Resps. to Pls.' First Req. for Admis. at 1–6, ECF No. 64 at 26–32.  The record contains some evidence that it was either not required, or not PIW's practice, to seek renewed consent if a consented-to medication's dosage was changed.  *See* Chvotkin Dep. 61:9–15, ECF No. 64 (noting that ███████████████████████████ ██████████).  None of the parties have attempted to either explain whether such circumstances may have applied or to clarify the District's inconsistent provision of consent.  Nor has Plaintiffs' expert, Dr. Michael Fox, identified in the record any specific instances in which a change in medication or dosage occurred without the required consent.  Indeed, as explained below, Dr. Fox admitted when pressed that his notes contained no comments "about consent being given or not," and that "it's clear from [his] record[s] that" he was not even asked to provide an opinion about the issue of consent.  Fox. Dep. 236:3–13, ECF No. 74-4.

to the medication Y.F. had been prescribed. *Id.* ¶ 21.  Ms. Jordan further testified that she did

not believe that Y.F. should have been prescribed that medication, *id.* ¶ 22, and Plaintiffs admit

that Ms. Jordan raised the issue with PIW at some point during Y.F.'s admission, *see* Pls.' Resp.

to D.C.'s Statement of Material Facts ¶ 26, ECF No. 74-8.



*See* PIW Ex. H at 1, ECF No.

62-10.

*Id.* at 2.

*Id.* at 1.

In August 2011, Ms. Jordan filed this lawsuit in the District of Columbia Superior Court

on behalf of herself and her daughter, naming as defendants the District, PIW, and Dr. Roque

Gerald, who served as the director of OCP during Y.F.'s treatment at PIW.  The complaint

alleged several claims under D.C. and federal law, including negligence, negligence *per se*,

failure to obtain informed consent, violation of D.C.'s Mental Health Consumers' Rights

Protection Act, and constitutional violations under 42 U.S.C. § 1983.  *See* Am. Compl. ¶¶ 29–66.

The District removed the lawsuit to this Court and both PIW and the District then moved to

dismiss.  This court previously dismissed all claims against Dr. Gerald and dismissed the

negligence *per se* and D.C. Mental Health Consumers' Rights Protection Act claims against

PIW.  *See generally Jordan v. District of Columbia*, 949 F. Supp. 2d 83 (D.D.C. 2013).

Following discovery, Plaintiffs now move for partial summary judgment on their § 1983

claim, and the District and PIW have filed cross-motions for summary judgment on all counts.

### III.  LEGAL STANDARD

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See id.* at 323.  In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See id.* at 324.  In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255.  Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

# IV.  ANALYSIS

The Court will begin, and ultimately end, with Plaintiffs' constitutional claim brought under 42 U.S.C. § 1983.  The Court notes at the outset that, to avoid summary judgment on their § 1983 claim, Plaintiffs must identify sufficient evidence in the record from which a reasonable jury could conclude that "the District of Columbia's conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  This "stringent requirement" is intended to "differentiate" constitutional claims from claims—like Plaintiffs' negligence claims—properly brought under "local tort law." *Id.*  In the context of a civilly committed individual like Y.F., the Supreme Court has instructed that a governmental actor's conduct meets this threshold, and exceeds constitutional bounds, only when that actor's decision "is such a substantial departure from accepted professional judgment, practices, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Because Plaintiffs are unable to meet this stringent standard here, the Court will grant summary judgment to Defendants on Plaintiffs' § 1983 claim.  In doing so, however, the Court cautions that its conclusion that "due process is not offended by" Defendants' conduct here "is not, of course, to imply anything about its appropriate treatment under [District] law." *Lewis*, 523 U.S. at 854 n.14.

## A.  Plaintiffs' Section 1983 Claim

Section 1983 provides a remedy against every person who "under the color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992); *see* 42 U.S.C. § 1983.  In order to hold a municipality like the

District of Columbia liable under § 1983, a plaintiff must show both a predicate violation of her

constitutional rights and that the violation resulted from a government policy or custom. *See*

*Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004). Thus, "proper analysis

requires" a court "to separate two different issues when a § 1983 claim is asserted against a

municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so,

whether the city is responsible for that violation." [5] *Collins*, 503 U.S. at 120.

　　Where the state involuntarily commits an individual, the "Constitution imposes upon [the

state] a corresponding duty to assume some responsibility for [that individual's] safety and

general well-being." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 197,

---

　　　[5] "Although § 1983 ordinarily does not create a cause of action related to the conduct of
private parties," where private conduct is "'fairly attributable' to the state," it "may be deemed to
be 'under color of state law.'" *Nader v. McAuliffe*, 593 F. Supp. 2d 95, 101 (D.D.C. 2009)
(quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)). Attribution generally
"occurs in two circumstances: when private parties 'conspire with state officials, and when they
willfully engage in joint activity with a state or its agents.'" *Id.* (quoting *Haoi v. Vo*, 935 F.2d
308, 313 (D.C. Cir. 1991)). Plaintiffs argue that PIW's conduct here is fairly attributable to the
District and that PIW should be considered a state actor. *See* Pls.' Mot. for Partial Summ. J. at
12–14 ("Pls.' Mot."), ECF No. 64. For purposes of this opinion the Court assumes without
deciding that PIW is properly considered a state actor because, as explained below, Plaintiffs are
unable to show that sufficient evidence exists from which a jury could conclude that PIW's and
the District's actions constitute a predicate constitutional violation at all. *Cf. Cohen v. District of
Columbia*, 744 F. Supp. 2d 236, 242 n.8 (D.D.C. 2010) (presuming for purposes of summary
judgment that private actor "is a state actor" because "the Court ultimately finds that Plaintiff has
not presented a cognizable Due Process claim").
　　　Nevertheless, the Court has some doubt that PIW can be characterized as a state actor,
given the referral relationship between PIW and the District and the Plaintiffs' concession that
"[m]edical decisions are made by the doctors at PIW and not the District of Columbia." Pls.'
Mot. at 13; *see also Scott v. Ambani*, 577 F.3d 642, 649 (6th Cir. 2009) (concluding that private
physician who treated prisoner "[u]pon referral by . . . a physician at the prison hospital," was
not a state actor because she had "no contractual relationship" with the prison and "just happened
to be the physician who provided treatment"); *West v. Atkins*, 487 U.S. 42, 54 (1988) (finding
physician directly "employed by North Carolina to provide medical services to state prison
inmates" a state actor, but emphasizing that "[t]he correctional setting . . . inevitably affects the
exercise of professional judgment," because "the nonmedical functions of prison life inevitably
influence the nature, timing, and form of medical care provided to inmates").

199–200 (1989); *see also Harvey v. District of Columbia*, 798 F.3d 1042, 1050–51 (D.C. Cir. 2015) (discussing *DeShaney* in the involuntary commitment context).  The District acknowledges that it has an affirmative constitutional duty to ensure the welfare of those children who are removed from their parents' custody through an abuse or neglect petition.

Plaintiffs' complaint alleges that Defendants "acted with deliberate indifference towards the constitutional rights of Plaintiff Y.F." by failing to, among other things, "adequately train and supervise their employees," "protect the children in their care from harm," "safeguard the rights and protect the welfare of [Y.F.]," "offer appropriate, adequate, and as needed, highly specialized diagnostic and treatment services and resources to [Y.F.]," and "ensure the protection of [Y.F.] from further experiences and conditions detrimental to her healthy growth and development."  Am. Compl. ¶ 43.  Together, Plaintiffs allege that "[s]uch deliberate indifference . . . amounts to a violation of Plaintiff's rights under the Fifth Amendment."  *Id.* ¶ 45.  In their motions for summary judgment, the District and PIW contend that Plaintiffs are unable to establish that Y.F.'s care rises to the level of deliberate indifference.  D.C.'s Mem. Supp. Summ. J. at 5–9, ECF No. 65; PIW's Mem. Supp. Summ. J. at 26–28, ECF No. 62-2.

Plaintiffs' own motion for summary judgment seems to narrow—or at least refine—their constitutional claim.  They contend that Defendants' care of Y.F. was "deliberately indifferent" to three specific liberty interests: Y.F.'s interest in being "free from unwanted bodily restraint," Y.F.'s interest in being free from "unwanted administrations of psychotropic medications," and Ms. Jordan's right "to have control over her child's medical decisions."  *See* Pls.' Mot. for Partial Summ. J. at 6–8 ("Pls.' Mot."), ECF No. 64; Pls.' Mem. Opp'n D.C.'s Mot. at 4–7, ECF No. 71.

### 1. Predicate Substantive Due Process Violations

The parties' filings evidence some confusion about the proper standard a court should employ to assess whether Plaintiffs can show a predicate constitutional violation. That confusion is understandable. Plaintiffs' claims are based on the Fifth Amendment's Due Process Clause, requiring this Court to "wade into the murky waters of that most amorphous of constitutional doctrines, substantive due process." *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005).[6] Thus, before analyzing Plaintiffs' claims, the Court clarifies the standard that it will apply.

Liberty interests protected by the Due Process Clause's substantive component are "not absolute." *Youngberg*, 457 U.S. at 319–20. The question "is not simply whether a liberty interest has been infringed," but whether "the extent or nature of" that infringement "is such as to violate due process." *Id.* at 320. To that end, the Supreme Court has consistently reiterated that "the "Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Lewis*, 523 U.S. at 848–49 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Instead, the Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of

---

[6] The constitutional tort of deliberate indifference originated in the Eighth Amendment, but the Supreme Court has "extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with" adequate medical care and other services "necessary to ensure their 'reasonable safety.'" *DeShaney*, 489 U.S. at 199 (citing *Youngberg*, 457 U.S. at 314–25). The specific liberty interests Plaintiffs now identify—the right to be free from unwanted antipsychotic medication, the right to be free from bodily restraint and to avoid unnecessary confinement for medical treatment, and a parent's right to seek and follow medical advice—are each protected by the substantive component of the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 221–22 (1990); *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *Parham v. J.R.*, 442 U.S. 584, 600 (1979); *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Because the "protections under the Fifth and Fourteenth Amendments are the same," these rights are equally applicable in this case, even though "only the Fifth Amendment applies to the District of Columbia." *English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013).

government,'" and that the Constitution does not, of its own accord, "guarantee due care on the part of state officials." *Id.* at 845, 848–49 (alteration in original) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). When the actions of government officials are at issue—as all agree they are here[7]—the Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" and rise to the level of a cognizable constitutional violation. *Id.* at 846 (quoting *Collins*, 503 U.S. at 129). And "for half a century now" the Court "ha[s] spoken of the cognizable level of executive abuse as that which shocks the conscience." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172–73 (1952)).

The Court's decision in *County of Sacramento v. Lewis* set forth the general guideposts that a court should follow when assessing whether a § 1983 claim establishes a conscience shocking infringement of a plaintiff's liberty interest. As the court explained, "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. Thus, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* at 849. Beyond that categorical more-than-negligence rule, however, the exact test for determining whether a particular government action shocks the conscience is more nuanced. What "shocks in one environment may not be so patently egregious in another." *Id.* at 850. Or, put another way, "'[t]hat which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.'" *Id.* (quoting *Betts v. Brady*, 316 U.S. 455, 462 (1942)).

---

[7] Either the District officials who oversaw Y.F.'s care while she was in CFSA's custody or her caregivers at PIW assuming, *arguendo*, that PIW can be considered a state actor for purposes of this action. *See supra* note 5.

Thus, a court's consideration of a substantive due process claim "demands an exact analysis of [the] circumstances before any abuse of power is condemned as conscience shocking." *Id.* Deliberate conduct "intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849. But the Court has recognized that, in some circumstances, conduct more akin to "recklessness or gross negligence" may violate the substantive due process guarantee. *Id.* (internal quotation marks omitted). In particular, the Court explained in *Lewis* that "deliberately indifferent conduct" is "enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." *Id.* 850. Similarly, the D.C. Circuit has held that where "the government assumes full responsibility for a child by stripping control from the family and placing the child in a government-controlled setting, the government has a duty not to treat the child with deliberate indifference." *Smith v. District of Columbia*, 413 F.3d 86, 95 (D.C. Cir. 2005). A government official's conduct amounts to deliberate indifference "when she has 'subjective knowledge of the [plaintiff's] serious medical need and recklessly disregard[s] the excessive risk to [his] health or safety from that risk.'"[8] *Harvey*, 798 F.3d at 1052 (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

In other circumstances, though, "deliberate indifference does not suffice for constitutional liability." *Lewis*, 523 U.S. at 852. In *Lewis* itself, the Court held that in the context of a high-

---

[8] The D.C. Circuit has emphasized that this deliberate indifference inquiry is a subjective one, distinct from the objective deliberate indifference standard used to determine whether a municipality's policy or custom of indifference to the constitutional violations committed by its employees gives rise to municipal liability under § 1983. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (distinguishing between the two standards); *Lewis*, 523 U.S. at 850 n.10 (same). Consequently, the cases the District cites applying this objective standard in the liability context are irrelevant to the Court's determination of whether the Plaintiffs can show a predicate constitutional violation. *See* D.C.'s Mem. Supp. at 6 (citing, for example, *Muhammad v. District of Columbia*, 881 F. Supp. 2d 115, 123 (D.D.C. 2012)).

speed automobile police chase "even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock" necessary to implicate liability. *Id.* at 853. Rather, an officer must act with "purpose to cause harm" to be constitutionally liable in those circumstances. *Id.* The Court found it informative that, unlike the custodial prison setting where "forethought about an inmate's welfare is not only feasible but obligatory," during a high-speed chase an officer does not have the "luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 851, 853.

Given *Lewis*'s nuanced analysis, Plaintiffs are largely correct when they state that *Lewis* identifies "two factors to consider" when determining whether an official's "deliberate indifference to the deprivation of a protected liberty interest can 'shock the conscience'" (specifically whether an official had adequate time for reflection and whether the situation called for the consideration of competing government needs). Pls.' Mot. at 7. Yet, it is perhaps most accurate to say that *Lewis* instructs courts to consider these factors, among others, when determining whether deliberate indifference is the proper yardstick against which to assess the government's action *at all*.

Similarly, this Court does not understand the standard identified in *Youngberg v. Romeo* to constitute an "additional factor that must be accounted for," as the Plaintiffs would have it. *Id.* In *Youngberg*, the Court considered whether the government's care violated an involuntarily committed individual's constitutional liberty interests "in safety and freedom from bodily restraint." 457 U.S. at 319. Specifically, the Court asked whether some minimal level of rehabilitative training was necessary "to avoid unconstitutional infringement of those rights" and to lessen the government's need to resort to the use of physical restraints. *Id.* at 318–19. The

Court explained that the plaintiff's interests were "not absolute," and that the question was "not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process." *Id.* at 320. The Court went on to hold that the "proper standard for determining whether a State has adequately protected the rights of the involuntarily committed," and whether "liability may be imposed," is whether a professional's decision "is such a substantial departure from accepted professional judgment, practices, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 321, 323. As a result, *Youngberg*'s "professional judgment" standard is best understood not as an "additional factor," but as the proper test to apply, in the place of "deliberate indifference" or "purpose to cause harm," to determine whether an official's conduct is conscience shocking in particular contexts and when certain liberty interests are at stake. *See Lewis*, 523 U.S. at 852 n.12 (describing the *Youngberg* standard as "categorized on much the same terms" as deliberate indifference).

With those contours in mind, the Court acknowledges that the precise standard to apply when assessing a civilly committed individual's substantive due process claim is not firmly established in this circuit. The D.C. Circuit recently declined to resolve whether the deliberate indifference standard or *Youngberg*'s "professional judgment" standard is appropriate. *See Harvey*, 798 F.3d at 1051. Several circuits have applied the *Youngberg* standard in the civil commitment context, while others have either applied the deliberative indifference standard or treated the two standards equivalently—diverging, at times, even within the same circuit. *Compare, e.g.*, *Patton v. Nichols*, 274 F.3d 829, 842 (4th Cir. 2001) (concluding that "denial-of-medical-care claims asserted by involuntarily committed psychiatric patients must be measured under *Youngberg*'s 'professional judgment' standard"), *Estate of Porter by Nelson v. Illinois*, 36

F.3d 684, 689 (7th Cir. 1994), *abrogated on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002) (same), *and Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (stating that the "reasonable professional judgment" standard "arguably applies" to a civilly committed individual), *with Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (asserting that "[i]n the context of medical professionals," the deliberate indifference standard "has been described as the 'professional judgment' standard"), *and Ketchum v. Marshall*, 983 F.2d 382 (10th Cir. 1992) (unpublished table decision) (applying the deliberate indifference standard to a voluntarily committed individual's claim); *see generally Battista*, 274 F.3d at 453 n.4 (collecting cases and noting that "[t]he decisions are not uniform").

Yet, in *Youngberg* the Supreme Court plainly understood the "professional judgment" standard to set a threshold lower than deliberate indifference. Before delineating the standard, the Court unequivocally declared that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321–22. This statement suggests that the *Youngberg* standard "requires more than simple negligence on the part of the doctor but less than deliberate indifference." *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996); *accord Estate of Porter*, 36 F.3d at 689 ("Application of the same standard—deliberate indifference—to both settings would undermine the Court's pronouncement that involuntarily committed patients are entitled to more protected 'conditions of confinement' than convicted criminals."); *Shaw by Strain v. Stackhouse*, 920 F.2d 1135, 1145 (3d Cir. 1990) (describing *Youngberg*'s holding as an "unambiguous rejection of the deliberate indifference standard in the context of involuntarily institutionalized" individuals). As the Fourth Circuit has explained, to apply the deliberate indifference standard to an involuntarily committed individual's claim

would give "involuntarily committed patients the *same* treatment as that afforded to convicted prisoners, a result the *Youngberg* Court specifically condemned." *Patton*, 274 F.3d at 838 (emphasis in original).

To be sure, whether the "professional judgment" standard is meaningfully more stringent is perhaps debatable. In *Lewis*, the Court described *Youngberg*'s standard as "characterized on much the same terms" as the deliberate indifference standard. 523 U.S. at 852 n.12. Even those courts that describe the "professional judgment" standard as "more plaintiff-friendly" imply that the "two standards are not all that far apart."[9] *Battista*, 645 F.3d at 453; *see also Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998) (describing the "professional judgment standard" as "at least as demanding" as deliberate indifference, but concluding that "there is minimal difference in what the two standards require of state actors"). Therefore, any dispute may not matter much. And, because the Court concludes that Plaintiffs are unable to even meet the potentially less-demanding "professional judgment" standard, whether the "professional judgment" standard or the "deliberate indifference" standard is most appropriate ultimately makes no difference to the outcome here. *Cf. Harvey*, 798 F.3d at 1052 (finding it unnecessary to decide the question because the plaintiff "prevails even under the deliberate indifference standard").

Given *Youngberg*'s guidance, however, the Court will apply the "professional judgment" standard in this case because Y.F. was civilly committed. *See* 457 U.S. at 321–22; *see also*

---

[9] Imply, in the case of *Battista*, because the First Circuit does not fully clarify whether the second of the "two standards" to which it referred was the "deliberate indifference" standard, 645 F.3d at 452, or a vaguely referenced "due process standard" that the plaintiff had "repeatedly invoked," *id.* at 453. Regardless, the court went on to emphasize the similarities between "the *Farmer* [deliberate indifference] and *Youngberg* tests," which both "leave ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Id.*

*Lewis*, 523 U.S. at 852 n.12 ("The combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare."). Each of the liberty interests that Plaintiffs identify—the right to be free from bodily restraint, the right to avoid the provision of unwanted medication, and Ms. Jordan's right to direct her daughter's medical care—relate directly to the care Y.F. received at PIW and while in the District's custody. Therefore, any infringement of those liberty interests will only shock the conscience if the infringement represents "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."[10] *Youngberg*, 457 U.S. at 323. For purposes of *constitutional* liability (as distinct from traditional tort liability), decisions "if made by a professional, are presumptively valid"; there "is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id.* at 323, 322–23.

---

[10] At least where, as in this case, no unusual circumstances abound. *Cf. Lewis*, 523 U.S. at 853 (noting that the Court has "found that deliberate indifference does not suffice for constitutional liability (albeit under the Eighth Amendment) even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance"). In addition, the Court acknowledges, in agreement with the District's contention, that the contours of a claim that the government has failed to provide sufficient medical treatment differs to some extent from a claim that one has not fully consented to (or has a liberty interest to refuse) medication. *See* D.C.'s Reply at 2–3, ECF No. 84 (citing, *e.g.*, *Pabon v. Wright*, 459 F.3d 241, 253 (2d Cir. 2006)). Yet, the D.C. Circuit has cited *Youngberg* approvingly for the proposition that whether medication is "'medically appropriate' obviously depends on the judgment of medical professionals" when explaining that the government may "forcibly administer antipsychotic medication" despite a defendant's liberty interest, if "such medication is 'medically appropriate.'" *United States v. Weston*, 255 F.3d 873, 876 (D.C. Cir. 2001). The Third Circuit has also applied the *Youngberg* standard to such claims. *See White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990) (citing *Youngberg* when noting that "authorities may administer anti-psychotic drugs to an unwilling patient only where the decision is a product of the authorities' professional judgment"); *see also Aruanno v. Glazman*, 316 F. App'x 194, 195 (3d Cir. 2009). Thus, the Court will apply *Youngberg*'s standard here to each of Plaintiffs' constitutional theories.

With this understanding in mind, the Court considers Plaintiffs' constitutional theories.

### a. Indifference to Y.F.'s Medical Care

As noted, Plaintiffs' summary judgment filings appear to have abandoned any broad claim that the District was generally indifferent to Y.F.'s serious medical needs.[11]  Yet, because Defendants seek summary judgment on the ground that their care was not deliberately indifferent to Y.F.'s medical needs, the Court considers the broader argument, applying the "professional judgment" standard.  *Accord Patton*, 274 F.3d at 842.

Defendants have provided ample evidence which, they contend, establishes that "the actions in question were taken pursuant to the orders of Y.F.'s physicians at PIW who exercised their professional judgment concerning her treatment."  D.C.'s Mem. Opp'n at 7, ECF No. 78.  PIW's initial report to the Family Division of the D.C. Superior Court in November 2006, signed by an attending psychiatrist, ███████████████████████████████████████████████ ████████████████████████████████████.  *See* D.C. Ex. 6, ECF No. 65-6.  The District has provided daily and group therapy progress notes from throughout Y.F.'s stay at PIW, charts depicting her medication administration, medication orders, and sample reports detailing the use of and justification for restraints and seclusions when employed.  *See* D.C. Exs. 8–10, ECF Nos. 65–8, 65–9, 65–10.  PIW has also supplied the progress note from Y.F.'s initial admission to PIW and the final discharge summaries describing the course of Y.F.'s treatment during each period she was treated there.  *See* PIW Exs. D, G, H, ECF Nos. 62–4, 62–7, 62–8.

---

[11] Indeed, there is an inherent tension between any claim that the District recklessly disregarded Y.F.'s health needs and the fact that Defendants' *did* provide medication and treatment to Y.F. (albeit treatment that, Plaintiffs contend, was unwanted and without proper consent).  *See* D.C.'s Mem. Supp. at 7 (arguing that "a claim of deliberate indifference might have arisen if the District did *not* provide Y.F. with the medical care she required" and noting that "the District paid qualified medical professionals to provide medical care for Y.F. at PIW" (emphasis added)).

In this face of this evidence, Plaintiffs have proffered the testimony of their own psychiatric expert, Dr. Michael Fox. As explained in more detail below, Dr. Fox's testimony takes little issue with PIW's use of seclusions and restraints or the prescription of antipsychotic medication, generally. Instead, his testimony essentially contends that PIW failed to reconsider its course of treatment once it became apparent (in his opinion) that Y.F. was not making adequate progress under the medication regime she was initially prescribed. He states that his "main concern about her treatment was in the lack of adequate use of practice parameters to manage her treatment and effectively change her treatment and the lack of any change in her behavior over a period of six months." Fox. Dep. 248:3–7, ECF No. 74-4. He further describes certain medications he would have prescribed instead of the ones PIW provided, and identifies why he believes Y.F. should have been diagnosed with Tourette's syndrome, rather than bipolar disorder. *See, e.g.*, *id.* 50:15–17, 60:17–61:6.

A mere disagreement about the scope of treatment or the proper diagnosis, however, is insufficient to shock the conscience and rise to the level of a constitutional due process violation. *Cf. Robinson v. United States*, No. 94–1037, 1995 WL 564187 (D.D.C. Sept. 14, 1995) ("[E]ven if defendants were negligent in their diagnosis and treatment of plaintiff's medical conditions, mere negligence does not state a constitutional claim."). As the Supreme Court has indicated, "the question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). The closest Dr. Fox's testimony gets to establishing any type of "accepted professional judgment" is his estimation that, although "99 percent of child psychiatrists" would have agreed with PIW's diagnosis and "given [Y.F.] a diagnosis of bipolar disorder," "at least 80 to 90 percent" would have considered changing their medication approach and "about 60 percent

would say, 'Maybe our diagnostic assumptions are wrong.'" Fox Dep. 70:18–71:7.  Yet, Dr. Fox

admits that this contention amounts to speculation.  He describes his estimate as "off the cuff"

and "guessing," and he fails to provide any evidence to back up that assertion.  *Id.* 71:6–7; *see*

*Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (noting that unsubstantiated speculation

fails to create a genuine issue of material fact); *see also Kulak*, 88 F.3d at 75 (concluding that

plaintiff's expert's "differing diagnosis . . . does not create a fact issue because his affidavit does

not assert that it was substantially below accepted professional judgment for the treating

physicians to believe that [the plaintiff] was manic or psychotic").

"[T]he Constitution only requires that the courts make certain that professional judgment

in fact was exercised" and it is inappropriate "for courts to specify which of several

professionally acceptable choices should have been made."  *Youngberg*, 457 U.S. at 321 (internal

quotation marks omitted).  In light of the voluminous record Defendants have produced

documenting the decisions made by treating physicians at PIW throughout Y.F.'s care, Dr. Fox's

speculation is insufficient to create a genuine issue of material fact.  A reasonable jury would not

be able to conclude on this record that Y.F.'s doctors "actually did not base [their treatment]

decision" on a "professional judgment."  *Id.* at 323.  At most, Dr. Fox's testimony might

establish that PIW and the District were negligent in failing to revise or reconsider Y.F.'s

treatment plan.[12]  But, "while it may be possible under District of Columbia tort law for a

---

[12] Defendants' memoranda take a myopic view of Dr. Fox's report and cherry-pick statements from his testimony to claim that Dr. Fox has merely offered his personal opinion about how he would have diagnosed and treated Y.F.  *See, e.g.*, D.C.'s Mem. Supp. at 15; PIW's Mem. Supp. at 22.  When considered as a whole, however, Dr. Fox's testimony clarifies that his opinion relates more to Y.F.'s doctors' failure to revise and reconsider her treatment in light of her failure to respond positively to her course of treatment—whatever the ultimate diagnosis. *See, e.g.*, Fox Dep. 69:20–70:3 ("My opinion in this case is not so much related to my differing opinions about what her diagnosis is.  My opinion is related to the inadequacy of the reevaluation and the changing of her medication management while an inpatient at PIW, regardless of what

plaintiff to obtain a remedy by proving mere negligence or failure to exercise due care, this

'lowest common denominator of customary tort liability' is 'categorically beneath the threshold

of constitutional due process.'" *Butera*, 235 F.3d at 651 (quoting *Lewis*, 523 U.S. at 849).

### b.  Ms. Jordan's Right to Have Control over her Child's Medical Decisions

The three liberty interests that Plaintiffs' *do* invoke in their motion for summary

judgment share a common theme.  Each is premised, to some degree, on the assertion that the

District and PIW violated Y.F.'s right to be free from unwanted treatment and Ms. Jordan's right

to direct her child's medical care by failing to obtain Ms. Jordan's consent before treating Y.F.

and by relying, instead, on the District's consent.  Plaintiffs' first claim is specific to Ms.

Jordan's liberty interest.  They argue that, despite the District's admission that Ms. Jordan's

parental rights were never terminated, the District improperly consented to numerous treatments

in her stead "even though [the District] knew it was not the proper party to provide consent."

Pls.' Mot. at 8.  Plaintiffs also claim that PIW improperly obtained and relied on the District's

consent.  *Id.* at 15–16.

Plaintiffs' claim related to Ms. Jordan's liberty interest fails on three scores, however,

each of which independently warrants granting summary judgment in Defendants' favor.  First,

the invocation of Ms. Jordan's own constitutional right to control Y.F.'s medical decisions is

nowhere to be found in Plaintiffs' complaint, and it is well settled that "a plaintiff is not

permitted to raise new claims at the summary judgment stage, where those claims were not

pleaded in the complaint."  *Taylor v. Mills*, 892 F. Supp. 2d 124, 137 (D.D.C. 2012).  Count III,

which is captioned as Plaintiffs' § 1983 claim, alleges only that the Defendants "acted with

---

her diagnosis is."); *id.* 77:14–78:1, 227:1–228–2.  Whether his testimony—which fails to cite to
any textbooks, protocols, guidelines, or articles—suffices to establish a national standard of care,
however, is best left for the D.C. Superior Court's consideration on remand.

deliberate indifference towards the constitutional rights *of Y.F.*"  Am. Compl. ¶ 43 (emphasis

added).  And the listed grounds upon which the complaint alleges Defendants were indifferent

relate exclusively to medical care.  *Id.*  To avoid this conclusion, Plaintiffs respond that a

separate count, Count II, "alleges the basis for Y.F.'s and Lakeisha Jordan's 42 U.S.C. § 1983

claim."  Pls.' Reply to D.C.'s Opp'n at 2, ECF No. 80.  Specifically, they point to paragraph 40

of the complaint which alleges that "Defendants failed to obtain consent from either Plaintiff or

her parent for the care and treatment rendered unto Plaintiff."  *Id.* (quoting Am. Compl. ¶ 40).

Although Count II is not identified as a § 1983 claim, the failure to specifically invoke § 1983 is

not necessarily fatal by itself.  *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014)

(holding that "no heightened pleading rule requires plaintiffs seeking damages for violations of

constitutional rights to invoke § 1983 expressly in order to state a claim").  Nevertheless,

nowhere in Count II of their complaint do Plaintiffs ever invoke Ms. Jordan's constitutional

rights at all.  Instead, the allegations specifically, and repeatedly, refer only to the fact that a

parent's consent "is mandated by District of Columbia Law."  *See* Am. Compl. ¶¶ 38, 39.  This

aligns with the separate, statutory claim that Count II alleges.  Viewed in its entirety, Count II

provides no indication that Plaintiffs intended to raise a separate constitutional claim premised

on Ms. Jordan's rights to direct her daughter's medical care.[13]

---

[13] Plaintiffs somewhat incoherently state in their Reply that "it is not possible for the
§ 1983 claim to only concern the medical treatment itself because the failure to obtain informed
consent from Lakeisha Jordan sounded in the negligence committed by the District of Columbia
against Y.F."  Pls.' Reply to D.C.'s Opp'n at 3.  A few sentences later, they seem to clarify that
"[t]he failure to obtain informed consent . . . constituted an essential part of the negligent medical
treatment administered to Y.F."  *Id.*  But to the extent Plaintiffs contend that the consent issue is
merely one facet of Defendants' negligent medical care, that argument is categorically
insufficient to raise a constitutional claim.  *Lewis*, 523 U.S. at 849 ("[L]iability for negligently
inflicted harm is categorically beneath the threshold of constitutional due process.").

Second, even had Plaintiffs alleged an infringement of Ms. Jordan's own constitutional liberty interest in their complaint, that claim is plainly barred by the statute of limitations. A three-year statute of limitations applies to § 1983 claims against the District of Columbia. *See Earle v. District of Columbia*, 707 F.3d 299, 305 (D.C. Cir. 2012); *see also* D.C. Code § 12–301(8). Under the discovery rule, however, the statute of limitations does not begin to run "until the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis of the action." *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C. Cir. 1991); *see also Crafton v. District of Columbia*, No. 14-cv-1505, 2015 WL 5611677, at *5 (D.D.C. Sept. 23, 2015) (applying the discovery rule to § 1983 claims).[14] Here, as the District points out, Ms. Jordan testified during her deposition that she was aware that Y.F. was being medicated while at PIW and that she had sought clarification from Y.F.'s social worker about why Y.F. had become unusually sad and drowsy. Jordan Dep. at 184:15–184:13, ECF No. 65-13. Ms. Jordan further testified that she "did not think that it was correct for [Y.F.] to have [the medication]." *Id.* at 187:17–19. And Ms. Jordan's mother testified that Ms. Jordan specifically attempted to raise her disagreement with doctors at PIW regarding Y.F.'s medication. *See* Kareem Dep. at 88:1–14, ECF No. 65-14. Together, this evidence demonstrates that by the time Y.F. was released from

---

[14] To support its invocation of the discovery rule as applied to Plaintiffs' statutory claim, the District appropriately cites to D.C. case law. With respect to Plaintiffs' § 1983 claim, however, "the *accrual date* is determined by federal law," as contrasted with "the applicable *limitations period*, which is determined by state law." *Crafton*, 2015 WL 5611677, at *4 (emphasis in original) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). This circuit has held that the discovery rule "is the general accrual rule in federal courts . . . in the absence of a contrary directive from Congress." *MCI Telecomm. Corp. v. FCC*, 59 F.3d 1407, 1416 (D.C. Cir. 1995) (internal quotation marks omitted). Therefore, the Court cites to the applicable federal recitation of the discovery rule. While there does not appear to be controlling D.C. Circuit case law specific to § 1983 claims, another court in this district recently applied the discovery rule to such claims. *See Crafton*, 2015 WL 5611677, at *5. This Court will do the same because, even assuming *arguendo* that the rule applies, Ms. Jordan's claim is time barred.

PIW in April 2007, Ms. Jordan was aware that medication had been provided without her consent.  Yet she failed to file a lawsuit until August 2011—after the three-year statute of limitations had run.[15]

Third, even if Ms. Jordan's claim was not barred by the limitations period, Plaintiffs have not identified any evidence to support their broad contention that "it is a substantial departure from accepted professional judgment to administer antipsychotic medications without obtaining informed consent from the patient and her parental guardians."  Pls.' Mot. at 8.  Plaintiffs repeatedly emphasize that Ms. Jordan's parental rights were not terminated.  That mere fact is insufficient, standing alone, to find that the District or PIW's conduct shocked the conscience, and Plaintiffs' argument sweeps too broadly if it is intended to imply that the government's

---

[15] In their opening brief the District raised the statute of limitations issue only with respect to Count II, the statutory informed consent claim (perhaps because summary judgment briefing took place simultaneously and, as just explained, a constitutional informed consent claim is not pleaded in Plaintiffs' complaint).  *See* D.C.'s Mem. Supp. at 20–27.  Only in its reply did the District extend that argument to cover Plaintiffs' constitutional claim.  D.C.'s Reply at 8–9.  Nevertheless, the facts relevant to the two statute of limitation issues are identical, and in their opposition Plaintiffs failed to respond to the District's argument in its entirety.  *See* Pls.' Mem. Opp'n D.C.'s Mot. at 24–26.

Plaintiffs' opposition did switch tacks to argue that Y.F. has an independent claim for infringement of her own liberty interest in avoiding unwanted medical treatment, and that *that* claim is tolled while she remains a minor.  *See id.*  Contrary to this position, the Supreme Court has suggested, and other courts have held, that a minor has no independent liberty interest to refuse medical treatment and that, before she reaches the age of maturity, the liberty interest is held by a minor's parents or guardian.  *See, e.g., Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990) (explaining that *Parham* "certainly did not intimate that . . . a minor child, after commitment, would have a liberty interest in refusing treatment"); *P.J. ex rel. Jensen v. Utah*, No. 2:05cv00739, 2006 WL 1702585, at *8 (D. Utah June 16, 2006) (holding that a minor "d[oes] not have his own right to refuse medical treatment" because "that right belongs to his parents" and his claim "is subsumed by his parents' claim").  In addition, it is hard to escape the conclusion that accepting Plaintiffs' contention would mean that any minor could resuscitate her parent or guardian's unsuccessful or time-barred claim once she reaches the age of maturity. In any event, as explained below, even if Y.F. does retain an intendent liberty interest, that interest is not absolute and the record contains insufficient evidence from which a reasonable jury could conclude that Defendants' decision to medicate Y.F. exceeded constitutional bounds.

consent to medical treatment on behalf of children in the government's custody is a categorically unconstitutional infringement on a parent's liberty interest. Indeed, in *Parham*, the only case that Plaintiffs cite for the proposition that a parent has a constitutional right to control her child's medical treatment, the Supreme Court explicitly recognized that "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." 442 U.S. 584, 603 (1979) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 230 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). Moreover, the government's decision to forcibly medicate an individual in its care without any consent does not automatically constitute an unconstitutional infringement of one's liberty interest. The "liberty interest in avoiding unwanted antipsychotic medication may be 'significant,' but it is not absolute," and "the government may, under certain circumstances, forcibly administer antipsychotic medication to a prisoner or criminal defendant despite his liberty interest, provided such medication is medically appropriate." *United States v. Weston*, 255 F.3d 873, 876 (D.C. Cir. 2001). Plaintiffs have pointed to nothing to indicate that, even if these strictures are satisfied, the government may not administer medically appropriate antipsychotic drugs to a child in its custody absent consent from the child's parent.

Y.F. was removed from her mother's custody under an abuse and neglect petition and admitted to PIW pursuant to a court order. PIW sought, and CFSA often provided, consent to treat Y.F. In fact, Dr. Fox, Plaintiffs own expert, testified that it was *his* understanding that the District was the proper party to consent to Y.F.'s treatment in these circumstances. Dr. Fox agreed that healthcare providers "had an obligation to get consent for treatment of Y.F" and that a failure to get such consent "is below the standard of care." Fox Dep. at 251:5–10, 13–15, ECF No. 74-4. Although Plaintiffs argue that this testimony supports their conclusion, their claim

relies on a selective quotation of Dr. Fox's testimony. Elsewhere in his deposition, Dr. Fox

states definitively that consent must come from "the person who has the authority authorized

from the state that you live in" and that his understanding was that CFSA had that authority in

Y.F.'s case. *Id.* 232:1–12. Moreover, when pressed, Dr. Fox admitted that his notes contained

no comments "about consent being given or not," and that "it's clear from my record that" he

was not even asked to provide an opinion about the issue of consent. *Id.* 236:3–13.

 Nor are Plaintiffs' assertions that both the District and PIW affirmatively *knew* that the

District was not the appropriate party to consent supported by the record.[16] In most cases,

Plaintiffs fail to cite anything in the record, making it difficult to assess whether any evidence

supports this claim. *See, e,g.*, Pls.' Mot. at 3, 8, 11; Pls.' Reply to PIW's Mem. Opp'n at 27. At

---

[16] The District of Columbia Court of Appeals held in 2010, as a matter of "first impression," that CFSA is "not authorized by statute to provide consent for [a minor's] psychotropic medication." *In re G.K.*, 993 A.2d 558, 559 (D.C. 2010). In the context of the Plaintiffs' statutory claim, the District acknowledges that Plaintiffs' "factual allegation and the legal conclusion have support" because, "after the events of this case, CFSA learned that [its consent] was not enough." D.C. Mem. Supp. at 20. While Plaintiffs invoke *In re G.K.* in passing as relevant to their constitutional claim, the Court of Appeals' holding has little bearing on the distinct question of whether the District's consent exceeded *constitutional* due process bounds. The court's decision in *In re G.K.* was based entirely on the governing statute. The court was asked to interpret whether, in circumstances where the Family Court has not appointed a guardian for a minor, the responsibility for consenting to "major medical, surgical, or psychiatric treatment"—which the statute allocates to the person with "guardianship"—should be placed with the person with "legal custody" over the child or remains a part of the "catch-all provision" of "residual parental rights." *See In re G.K.*, 993 A.2d at 565. The court found it informative that the statute specifies that a legal custodian's responsibility "is subordinate to the rights and responsibilities of the guardian of the person of the minor *and any residual parental rights and responsibilities*." *Id.* at 564 (emphasis in original) (quoting D.C. Code § 16-2301(21)). Therefore, to the extent Plaintiffs refer to the "residual parental rights" of Ms. Jordan, it is clear that *In re G.K.* used the term as a specific statutory reference, not as establishing a constitutional principle. And, given the Supreme Court's caution that parental rights are not absolute, and Dr. Fox's testimony that, in his estimation, it was not professionally improper to obtain consent from the District, it is not clear that any statutory violation is automatically a constitutional one as well. Whatever the District's statutory scheme demands, PIW's failure to obtain consent from Ms. Jordan and its reliance on the District's consent is hardly the smoking gun, as a constitutional matter, that Plaintiffs portend.

one point Plaintiffs do cite generally to the District's amended responses to their request for admissions to support their contention that the District "has now admitted that it did in fact provide consent for numerous medications for which it knew that it was not the appropriate party to offer such consent in light of the fact that Ms. Jordan's parental rights had not been terminated."  Pls.' Mot. at 11.  While those responses contain no explicit acknowledgement by the District that it was not the proper party to provide consent, the District does admit that "[o]n some occasions CFSA nurses provided consent for Y.F. to take certain medications."  D.C.'s Am. Answers to Pls.' First Req. for Admis. at 2.  And the District's initial responses further admit that Ms. Jordan's parental rights were never terminated.  *See* D.C.'s Resps. to Pls.' First Req. for Admis. at 6.  But, as just explained, this admission is insufficient as a categorical matter to establish a constitutional violation.  The District's designee, Cheryl Durden, acknowledged during her deposition that the District's practice "shifted" sometime between 2007 and 2008 to require that a parent consent to the administration of antipsychotic medication, but testified that, at the time Y.F. was in the District's custody, the District's practice was to consent to the medical treatment of those children in its custody.  Durden Dep. at 53:13–19, 13:18–16:15, 30:4–16, ECF No. 64.  PIW's Vice President and Chief Operating Officer, Carol Desjeunes, similarly testified that PIW's psychotropic medication consent policy required ███████████████████ ███████████████████████████████████████████.  *See* Desjeunes Dep. 53:12–57:4, ECF No. 64.  Finally, Richard Chvotkin, a social worker at PIW during the relevant time period, testified ██████████████████████████████████████████████████████████████ █████████████.[17]  Chvotkin Dep. at 47:5–18, ECF No. 64.

---

[17] To imply that that PIW knew CFSA was not the proper party to consent Plaintiffs emphasize ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

All of this is to say that, even if a timely consent claim was properly pleaded in Plaintiffs' complaint, the record lacks sufficient evidence from which a reasonable jury could conclude that Defendants' reliance on consent by the District fell substantially below accepted professional judgment so as to shock the conscience.[18]  Plaintiffs may have a colorable claim that the District or PIW was negligent or violated the District of Columbia's statute requiring informed consent. But that possibility does not transform the course of events into a concomitant substantive due process violation.

### c. Y.F.'s Right to Avoid the Unwanted Administration of Antipsychotic Drugs

As to the actual administration of the medications, the Due Process Clause also protects "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221 (1990).  Yet again, while this liberty interest "may be 'significant,' . . . it is not absolute." *Weston*, 255 F.3d at 876.  As the D.C. Circuit has recognized, the Supreme Court's precedents stand for the proposition that "under certain circumstances," the government may forcibly administer antipsychotic medication, "despite [one's] liberty interest, provided such medication is medically appropriate." *Id.* at 876 (internal quotation marks omitted).  And "[w]hether a proposed course of action is 'medically appropriate'

---

Chvotkin Dep. at 38:18–39:4, 44:15–45:4.  But Mr. Chvotkin's deposition provides no indication that, █████████████████████████████████████████████████.  In fact, he clarified that he ███████████████████████████████████████████████████████████████████ *Id.* at 47:5–12.

[18] As explained below, despite Plaintiffs' claim that Ms. Jordan's consent was never sought, Dr. Fox takes no issue with Y.F.'s initial admission, the fact that she was treated with medication or seclusions, generally, or any of the specific medications Y.F. was administered (other than his contention that those medications should have been discontinued in favor of alternative ones once it became apparent, in his view, that Y.F.'s condition has not meaningfully improved).

obviously depends on the judgment of medical professionals." *Id.* (citing *Youngberg*, among other cases).[19]

Plaintiffs proffer two grounds for concluding that the administration of antipsychotic drugs to Y.F. exceed constitutional bounds here.  First, they claim that "a medically appropriate reason for forcibly administering psychotropic medications only exists when, after considering less intrusive alternatives, it is essential for the safety of the patient or those around her."  Pls.' Mot. at 7–8.  They then assert—without citation to any record evidence—that Y.F.'s █████████ ███████████████████████████████  *Id.* at 8.  To the extent this claim is intended to argue that the administration of *any* antipsychotic drugs was improper here, Dr. Fox's testimony again belies that contention.  Dr. Fox testified that he "[a]bsolutely" agreed that it was "appropriate to administer antipsychotic medications" when Y.F. was first admitted to PIW.  Fox. Dep. 215:16–21.  He further explained that, when "used appropriately and effectively," those medications can have "a positive effect on the patient's development and behavior and mood" and "a healing effect over the long run."  *Id.* at 216:8–11.  Moreover, far from indicating that medication was an inappropriate tool to control Y.F.'s outbursts, Dr. Fox in fact questioned the use of seclusions and restraints because he believed *medication* could more properly manage Y.F.'s behavior.  *Id.* at 100:10–19; *see also id.* at 206:22–207:4 (contending that the frequency with which Y.F. was restrained or secluded "may episodically have improved ███████████ ██████████████████████████████████).  He agreed that he was "not critical of PIW

---

[19] *Weston* involved a criminal defendant awaiting trial.  While it appears that the D.C. Circuit has not yet confronted a case involving a civilly committed individual, other courts have applied the *Youngberg* standard to assess the merits of substantive due process claims that a civilly committed individual was forcibly medicated.  *See, e.g.*, *Johnson v. Tinwalla*, No. 13-3227, 2015 WL 5734913, at *3 (C.D. Ill. Sept. 29, 2015); *Howell v. Springfield Hosp. Ctr.*, No. 13-811, 2014 WL 1388262, at *3–4 (D. Md. April 7, 2014).

administering ██████████████ when it did," only that "it was not administered on an

ongoing basis." *Id.* at 61:7–13; *see also id.* at 59:12–19 (describing, approvingly, the use of

████████████████████████).

The entire thrust of Dr. Fox's testimony is merely that different medications should have

been prescribed to treat the real cause of Y.F.'s illness. But Plaintiffs do not identify a single

instance in which Dr. Fox is critical, generally, of PIW's use of medication to control Y.F.'s

outbursts—and the Court has identified none in its own review of Dr. Fox's deposition and

expert report. *Cf. Aruanno v. Glazman*, 316 F. App'x 194, 195 (3d Cir. 2009) (concluding that

an inmate's Eighth Amendment claim that "forced medication was unwarranted . . . can not

survive the defendants' motion for summary judgment absent expert testimony that would

dispute the defendants' assertions that the treatment he received was medically necessary").

Plaintiffs' second contention is that "it is a substantial departure from accepted

professional judgment to administer antipsychotic medications without obtaining informed

consent from the patient and her parental guardians." Pls.' Mot. at 8. But, as the Court just

explained, Plaintiffs identify no evidence supporting this broad assertion and, when pressed, Dr.

Fox admitted that "it's clear from my record that" he was not even asked to provide an opinion

about the issue of consent. Fox Dep. at 236:3–13. Moreover, even absent any consent, the

government may forcibly administer antipsychotic medications, "despite [one's] liberty interest,

provided such medication is medically appropriate." *Weston*, 225 F.3d at 876. In the face of the

evidence Defendants have proffered about the course of Y.F.'s treatment, Plaintiffs have not

identified anything in the record from which a reasonable jury could conclude that PIW lacked a medically appropriate reason to provide the medication it did to Y.F.[20]

### d. Y.F.'s Right to be Free from Unwanted Bodily Restraint

Finally, Plaintiffs also invoke Y.F.'s right to be "free from bodily restraint," Pls.' Mot. at 6, which is undoubtedly a liberty interest guaranteed to those was are involuntarily committed, *Youngberg*, 457 U.S. at 316; *see also Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Plaintiffs' memoranda only fleetingly reference this claim, however.  Plaintiffs simply assert that District and PIW has violated "Y.F.'s right to be free of involuntary restraints," without any effort to further develop that assertion or to identify evidence in the record supporting it.  Moreover, where Plaintiffs do make this assertion, the discussion that follows is limited to Plaintiffs' claims respecting the administration of antipsychotic medication.  *See, e.g.*, Pls.' Mot. at 7–8; Pls.' Reply at 5–7; Pls.' Mem. Opp'n D.C.'s Mot. at 4–7; Pls.' Mem. Opp'n PIW's Mot. at 21, 24–26.  Accordingly, Plaintiffs have almost certainly waived this claim.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

Nevertheless, even drawing all inferences in Plaintiffs' favor and accepting their evidence as true, it is clear that this record cannot establish that the use of restraints on Y.F. was "such a

---

[20] For this same reason, although it may be relevant to Plaintiffs' negligence or statutory informed consent claims, any discrepancies in the record regarding the specific occasions on which the District did or did not provide consent for Y.F.'s medication are ultimately immaterial to Plaintiffs' constitutional claim.  *See supra* note 4.

substantial departure from accepted professional judgment, practices, or standards as to

demonstrate that the person responsible actually did not base the decision on such a judgment."

*Youngberg*, 457 U.S. at 323. For one thing, Dr. Fox's disposition testimony takes no issue with

the use of restraints. He testified to the following:

> [Mr. Block, PIW's counsel] Q:       Do you have a sense that in the acute
> inpatient child clinical setting, the use of restraints and seclusions is medically
> appropriate?
>
> [Dr. Fox] A:   Yes, if she's endangering herself or others.
>
> Q:       Do you have an understanding that that's what happened in those
> instances involving Y.F. here?
>
> A:       That's my exact belief, yes.
>
> Q:       If I understand your testimony, you're not critical of that?
>
> A:       No.
>
> Q:       Correct?
>
> A:       Correct.

Fox Dep. at 83:21–84:10. Dr. Fox did later clarify that he was critical that Y.F.'s care

"continued on and on without a change in the treatment plan," which, in his estimation, resulted

in the need to use seclusions to control her behavior "inappropriately and for too many times."

*Id.* at 100:10–13. But that assertion simply reiterates Dr. Fox's general claim about the course of

Y.F.'s treatment which, as the Court has already explained, Plaintiffs fail to establish fell

substantially below professional standards. In any event, even if Dr. Fox's testimony supports

the notion that PIW could have lessened the number of instances when PIW needed to resort to

seclusions or restraints, his testimony provides no evidence that when—for whatever reason—

Y.F.'s behavior did become a danger, her physicians' decision to resort to restraints and

seclusions was a substantial departure from accepted professional judgment. *See* Fox Dep. at

84:2 (stating that the use of restraints is medically acceptable if a patient "is endangering herself or others").

Furthermore, "decisions made by the appropriate professional are entitled to a presumption of correctness," *Youngberg*, 457 U.S. at 324, and the District has proffered two forms that they describe as "samples" of the restraint records, *see* D.C.'s Mem. Supp. at 2. Those forms describe the specific justification for employing the physical hold, restraint, or seclusion in each instance. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* D.C.

Ex. 8 at 1, ECF No. 65-8.  Similar justifications were offered for another physical hold administered later that same day.  *Id.* at 3.  The record does not clarify whether the limited number of restraint records the District has provided constitute the entire collection.  Regardless, Dr. Fox confirmed during his testimony that he was not aware of any instance in which PIW had failed to monitor or document the use of physical restraints or seclusions.  He testified that the records "appeared to be adequate."[21]  Fox Dep. at 164:10–15.

Consequently, from the limited evidence Plaintiffs have adduced a reasonable jury could only conclude that PIW's use of restraints and seclusions was not a substantial departure from accepted professional judgment.

---

[21] Nor do Plaintiffs provide any factual or legal support for their contention that "PIW knew that consent must be obtained from Lakeisha Jordan for these restraints and/or seclusions." *See* Pls.' Mot. at 8.  As a factual matter, Mr. Chvotkin testified that ████████████████████ ████████████████████████████████  Chvotkin Dep. at 36:11–14.  Legally, although *Youngberg* involved the use of physical restraints, the Court made absolutely no mention of the need to secure informed consent before administering them.  *See generally* 457 U.S. at 307–325.

## 2.  Municipal Liability

Because the Court has concluded that Plaintiffs cannot establish a predicate constitutional violation to support their § 1983 claim, the Court need not resolve whether Plaintiffs can show that an "official policy" of the District of Columbia or "'practices so widespread as to practically have the force of law'" were the "'moving force'" behind any constitutional injury.  *Moreno v. District of Columbia*, 925 F. Supp. 2d 93, 99 (D.D.C. 2013) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). Nevertheless, Plaintiffs' only effort to identify a policy or custom is their contention that the District failed "to train, supervise and discipline PIW agents, servants and employees on how to appropriately obtain informed consent from a minor such as Y.F."  Pls.' Mot. at 10.  To support that claim, they rely exclusively on a consent decree entered in 1991 after this court determined that the District's child welfare system violated District, federal, and constitutional law.  *See LaShawn A. v. Dixon*, 762 F. Supp. 959 (D.D.C. 1991).  This reliance suffers from two basic infirmities.

First, Plaintiffs have not identified any aspect of the consent decree that is relevant to the issue of informed consent.  Admittedly, the consent decree was based on an "extensive list of allegations against District officials that the district court found to be based in fact."  *LaShawn A. by Moore v. Kelly*, 990 F.2d 1319, 1321 (D.C. Cir. 1993).  Those allegations included the District's failure to "initiate timely investigations into reports of abuse or neglect," failure to "provide services to families to prevent the placement of children in foster care," and failure "to place those who may not safely remain at home in appropriate foster homes and institutions."  *Id.* (quoting *LaShawn A.*, 762 F. Supp. at 960).  Yet Plaintiffs have done no more than baldly assert that the decree is relevant to a finding that the District had a widespread policy of failing to

obtain lawful consent for the medical treatment of those in the District's care.  Even more

problematic, Plaintiffs make no effort to specify what, if any, shortcomings continued over a

decade and a half later, in 2006 and 2007, when the events at issue in this case took place.

Second, even if the *LaShawn* decree has some relevance to the specific issue of consent,

the decree has no bearing as a *constitutional* matter.  On appeal, the D.C. Circuit upheld the

*LaShawn* decree based only on District statutory law, and explicitly declined to consider the

decree as a matter of federal constitutional law.  *See LaShawn A. by Moore v. Kelly*, 990 F.2d

1319, 1322 (D.C. Cir. 1993) (explaining that "it is not necessary for us to confront these

constitutional and federal statutory issues, for the district court judgment is completely

supportable on the grounds of local law").  The Court remanded the case to the district court so

that it could fashion a revised consent decree based exclusively on District statutory law, which

the district court did, and the Circuit later upheld.  *See LaShawn A. v. Barry*, 1996 WL 679301

(D.C. Cir. 1996) (summarily affirming revised consent decree, despite the fact the consent decree

extended somewhat "beyond federal law" because defendants had consented to the decree,

"District law is not materially less demanding than federal law," and the district court had

implicitly reasoned that "the substitution of District law alone as the basis of the decree, in place

of reliance on federal plus District law, did not materially undermine the District's consent").

Therefore, any reliance on the *LaShawn* decree as definitive evidence that the District was

engaged in widespread constitutional violations is inherently questionable.  In the absence of any

effort by Plaintiffs to further develop that connection, the Court would be disinclined to rely on

the *LaShawn* decree to find evidence of a District of Columbia custom or policy, were it necessary to resolve this case.[22]

## B.  Remaining D.C. Law Counts

The District removed this action on the basis of federal question jurisdiction.  *See* Notice of Removal, ECF No. 1.  Having granted summary judgment to Defendants on the only count founded on federal law, the Court retains only supplemental jurisdiction over the remaining District law claims and has discretion to decline to exercise that jurisdiction.  *See* 28 U.S.C. § 1367(c).  The Court will remand the remaining claims to the District of Columbia Superior Court.  "[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005).  Given the potential that some novel issues of local law may be raised in the wake of *In re G.K.*, 993 A.2d 558 (D.C. 2010), comity and judicial economy weigh in favor of remand, and there is

---

[22] Because the Court has granted summary judgment to Defendants on the § 1983 claims it need not consider whether PIW can invoke qualified immunity.  Thus, the Court will deny as moot PIW's motion for leave to file an amended answer raising a qualified immunity defense and will similarly deny as moot Plaintiffs' motion to file a sur-reply contesting PIW's qualified immunity argument.  The Court notes, however, that despite PIW's invocation of Federal Rule of Civil Procedure 15(a)(2), which provides that leave to amend should be "freely give[n]," PIW filed its motion almost sixteen months after this Court's January 8, 2014 deadline for amending the pleadings, *see* Scheduling Order, ECF No. 24.  In such circumstances, the "good cause" standard of Rule 16(b) applies.  *See Lurie v. Mid-Atlantic Permanente Med. Grp., P.C.*, 589 F. Supp. 2d 21, 23 (D.D.C. 2008) (collecting cases); *see also O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004) ("[L]itigants cannot be permitted to treat a scheduling order as a frivolous piece of paper idly entered, which can be cavalierly disregarded without peril.").  The good cause standard "emphasizes the diligence of the party seeking the amendment," *O'Connell*, 357 F.3d at 155, but PIW's motion contains no explanation for its eleventh-hour motion filed at the tail end of summary judgment briefing and nearly a year after the close of discovery.

no reason to depart from this typical course here.  Accordingly, the Court will remand the remaining claims to the District of Columbia Superior Court.

## V.  CONCLUSION

To reiterate, the Court merely holds that this record fails to support Plaintiffs' claims that the Defendants' conduct rises to the stringent, conscience shocking level necessary to support a substantive due process § 1983 claim.  Whether the course of events here, including CFSA's inconsistent provision of consent for Y.F.'s medical treatment, raises genuine issues of materials fact in the context of Plaintiffs' tort or D.C. statutory claims, is a question best left for the District of Columbia Superior Court on remand.  For the foregoing reasons, Plaintiffs' motion for partial summary judgment is **DENIED**, Defendants' respective motions for summary judgment are **GRANTED IN PART**, PIW's motion for leave to file an amended answer is **DENIED AS MOOT**, Plaintiffs' motion for leave to file a sur-reply is **DENIED AS MOOT**, and Plaintiffs' remaining claims are **REMANDED** to the District of Columbia Superior Court.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 29, 2016                                              RUDOLPH CONTRERAS
                                                                              United States District Judge